COURT OF APPEALS
DECISION
DATED AND FILED

November 24, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1855**

Cir. Ct. No.  **1996CI842**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE COMMITMENT OF ROY C. O'NEAL:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

ROY C. O'NEAL,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Brown County: WILLIAM M. ATKINSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Roy O'Neal appeals an order denying his petition for discharge from his commitment as a sexually violent person under WIS. STAT. ch. 980 (2017-18).[1] O'Neal argues the State failed to present sufficient evidence to support a finding that he is more likely than not to commit a future act of sexual violence. We reject O'Neal's argument and affirm.

## BACKGROUND

¶2 In 1996, the State petitioned to commit O'Neal as a sexually violent person under WIS. STAT. ch. 980. The petition alleged that on December 23, 1975, O'Neal was convicted of two sexually violent offenses—second-degree murder, contrary to WIS. STAT. § 940.02 (1973-74), and attempted rape, contrary to WIS. STAT. §§ 939.32 and 944.01 (1973-74). The victim of those offenses was a seventeen-year-old female. Based on the allegations in the original criminal complaint, the petition characterized both offenses as being "sexually motivated." The petition included a psychologist's opinion that O'Neal suffered from a mental disorder—namely, sexual sadism—that predisposed him to commit sexually violent acts. The psychologist further opined that O'Neal's sexual sadism created a substantial probability that he would engage in future acts of sexual violence.

¶3 O'Neal stipulated to his commitment as a sexually violent person, and in September 1996, the circuit court entered an order committing him to inpatient treatment in a secure mental health facility. In April 2014, O'Neal petitioned for supervised release. The parties stipulated that supervised release was appropriate, and O'Neal was ultimately placed on supervised release in August 2015.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶4 In January 2018, O'Neal petitioned for discharge from his WIS. STAT. ch. 980 commitment, based on a report authored by psychologist Charles Lodl. The circuit court determined that O'Neal was entitled to a discharge trial, and the court subsequently held a bench trial on O'Neal's discharge petition in September 2018. At trial, the parties stipulated that O'Neal had been convicted of a sexually violent offense, for purposes of ch. 980. The court then heard evidence related to the remaining two elements the State was required to prove in order to defeat O'Neal's discharge petition—specifically, that O'Neal had a qualifying mental disorder, and that O'Neal was dangerous to others because his mental disorder made it more likely than not that he would engage in one or more future acts of sexual violence. *See* WIS JI—CRIMINAL 2506; *see also* WIS. STAT. § 980.01(7).

¶5 The State's first witness at trial was psychologist Laura DeMarzo, a Sand Ridge Secure Treatment Center employee who had completed O'Neal's treatment progress reports in 2017 and 2018. DeMarzo testified that O'Neal had initially struggled to adjust to his community placement in 2015, but she also noted that he had shown positive engagement and progress in treatment since 2016. DeMarzo testified, however, that O'Neal at times had trouble applying his treatment in a community setting. For instance, she explained that O'Neal had violated his rules of supervision by making unapproved purchases and by "[n]ot always being forthcoming" about his arousal patterns and about "being in the presence of individuals under the age of 18."

¶6 DeMarzo also testified that in 2017, O'Neal had engaged in "offense paralleling behavior"—that is, behavior that "mirrors or has aspects [of his past] sex offending"—toward one of his treatment monitors. DeMarzo explained that O'Neal had admitted sexually fantasizing about the monitor, who was a young woman, and engaging in "sadistic games" to see how she would react. O'Neal also admitted

3

experiencing sexual attraction to postpubescent teenagers, as well as having sexual thoughts about a ten-year-old girl.

¶7      The State's second witness at trial was psychologist Dawn Pflugradt, who had performed O'Neal's annual reexamination in 2018. Pflugradt testified that O'Neal suffers from several qualifying mental disorders for purposes of WIS. STAT. ch. 980, specifically: sexual sadism in a controlled environment; exhibitionistic disorder in a controlled environment; voyeuristic disorder in a controlled environment; and antisocial personality disorder. Pflugradt testified that O'Neal's sexual sadism and antisocial personality disorder each individually predispose him to engage in acts of sexual violence, while his exhibitionistic disorder and voyeuristic disorder predispose him to commit such acts "in combination with the sadism." Pflugradt explained that O'Neal's exhibitionism and voyeurism "started his sexual arousal patterns[,] which then prompted deviant sexual fantasies[,] which then would predispose him to sexual violence."

¶8      Pflugradt also opined that O'Neal's mental disorders make it more likely than not that he will commit a future act of sexual violence. Pflugradt explained that she assessed O'Neal's risk of reoffense using both the Static-99R and the VRS-SO. She testified O'Neal scored a seven on the Static-99R, which meant that his characteristics matched "a group of offenders who were in the well above average risk range or were at high risk of reoffending." Using the VRS-SO, Pflugradt determined that O'Neal's pretreatment score was 43, his posttreatment score was 34.5, and his change score was 8.5.

¶9      Based on O'Neal's scores on the Static-99R and the VRS-SO, Pflugradt determined his risk of committing a sexually violent offense in the next ten years was "in the upper 30's." Pflugradt noted, however, that WIS. STAT. ch. 980

requires her to assess "lifetime risk." She also stated that the Static-99R underestimates an individual's risk of reoffense because it does not account for undetected sexual reoffenses. After applying "conservative" multipliers to address those additional considerations, Pflugradt determined O'Neal was more likely than not to commit a future act of sexual violence during his lifetime. Specifically, she testified that O'Neal's risk of committing a future sexually violent act was "[t]wo to three percentage points" above fifty percent.

¶10 O'Neal was sixty-one years old at the time of his discharge trial. Pflugradt acknowledged that research suggests an offender's risk of reoffense decreases with age, particularly once the offender reaches age sixty. Because O'Neal was healthy and active for his age, however, Pflugradt testified she believed his risk of reoffense "still may be higher than your average 60-year-old or 61-year-old."

¶11 On cross-examination, Pflugradt acknowledged that O'Neal's noncontact offenses involving voyeurism and exhibitionism did not qualify as sexually violent offenses under WIS. STAT. ch. 980. Nevertheless, Pflugradt testified that she appropriately considered those offenses when scoring O'Neal on the Static-99R. She explained that O'Neal's voyeuristic and exhibitionistic offenses were "wrapped into hypersexuality and sexual fantasies of violence," and that O'Neal had reported "fantasiz[ing] about violent offenses" when committing his noncontact offenses.

¶12 More specifically, Pflugradt observed that during treatment, O'Neal had acknowledged "that all of his hands-off offenses at some point in time have caused him to have sexually violent fantasies or caused him to want to commit a hands-on offense." For example, Pflugradt noted O'Neal had self-reported that

when he was seventeen years old, he was riding on a motorcycle when he saw a fourteen-year-old girl and exposed his penis to her. O'Neal subsequently grabbed the girl's breast and attempted to rape her. Pflugradt noted that in that instance, O'Neal's noncontact offense—exhibitionism—was "directly linked" to his sexually violent conduct. Thus, even though O'Neal's sex offenses involving voyeurism and exhibitionism were not sexually violent, Pflugradt believed those offenses contributed to his risk of committing a sexually violent act because he had violent fantasies before or after engaging in his voyeuristic and exhibitionistic offenses, and "the violence has been connected to those" offenses.

¶13    O'Neal called two witnesses to testify on his behalf at the discharge trial: Lodl (the psychologist whose report O'Neal had submitted in support of his discharge petition) and psychologist David Thornton. Both Lodl and Thornton testified that O'Neal had two qualifying mental disorders for purposes of WIS. STAT. ch. 980: sexual sadism and antisocial personality disorder. Like Pflugradt, Thornton also diagnosed O'Neal with exhibitionistic disorder and voyeuristic disorder. Lodl similarly diagnosed O'Neal with exhibitionistic disorder, and he noted that other examiners had diagnosed O'Neal with voyeuristic disorder. Thornton and Lodl both opined, however, that O'Neal's exhibitionistic and voyeuristic disorders were not qualifying mental disorders under ch. 980 because they did not predispose O'Neal to commit acts of sexual violence. Nonetheless, Lodl acknowledged that both of those disorders "appeared to be in the service of [O'Neal's] sadistic interests and arousal to women."

¶14    Unlike Pflugradt, both Thornton and Lodl concluded O'Neal's risk of committing another sexually violent act did not exceed the "more likely than not" threshold. While Thornton agreed with Pflugradt's scoring of O'Neal on the Static-99R and the VRS-SO, he testified O'Neal's risk of committing a sexually

6

violent act was "probably somewhere in the ra[n]ge of about 25 percent." Thornton acknowledged that his testimony in that regard differed from his report, which stated O'Neal's "lifetime risk for new acts of sexual violence is presently a little below 50%." He explained that since preparing his report, he had "made greater allowance" for the distinction between future noncontact sex offenses and future sexually violent offenses. He testified he believed O'Neal primarily posed a risk of committing future noncontact sex offenses—specifically, exposing himself to others—rather than sexually violent offenses. Thornton also disagreed with Pflugradt's opinion that O'Neal's age did not reduce his risk of committing future sexually violent acts.

¶15    Lodl similarly opined that O'Neal was "below the more likely than not standard for continued commitment." Based in large part on O'Neal's score on the Static-99R, Lodl opined that O'Neal's risk of committing a future act of sexual violence was "up to 37 percent" over a ten-year period.

¶16    The circuit court denied O'Neal's discharge petition, concluding the State had "met its burden and shown by clear and convincing evidence that [O'Neal] remains a sexually violent person at this time." The court first found, based on the parties' stipulation, that O'Neal had been convicted of a sexually violent offense. Second, the court found that O'Neal suffered from a mental disorder for purposes of WIS. STAT. ch. 980.

¶17    The circuit court then turned to the third element—whether O'Neal was more likely than not to commit a future act of sexual violence. The court acknowledged that Pflugradt, Thornton, and Lodl disagreed about O'Neal's risk of reoffense, and that Thornton and Lodl had determined his risk was less than fifty percent. Nevertheless, the court stated it gave Pflugradt's testimony "greater

weight" than that of Thornton and Lodl because Pflugradt "always [had] a specific reason to back up every bit of her testimony." The court explained, "[O]ne of the factors the Court has to consider when you have opposing expert testimony is who has presented the factual background to support the testimony, and I thought that [Pflugradt] did an excellent job of that."

¶18    The circuit court acknowledged that Thornton was one of the "originators" of the Static-99R. The court questioned Thornton's credibility, however, based on the substantial difference between his report's assessment that O'Neal's risk of reoffense was "a little below 50%" and his trial testimony that O'Neal's risk of reoffense was only about twenty-five percent. The court did not specifically address Lodl's credibility.

¶19    Based on Pflugradt's testimony, the circuit court concluded the State had met its burden to prove that O'Neal was more likely than not to commit a future act of sexual violence, although only "by the razor thin edge." The court therefore entered a written order denying O'Neal's discharge petition, and O'Neal now appeals.

**DISCUSSION**

¶20    At O'Neal's discharge trial, the State had the burden to prove by clear and convincing evidence that O'Neal still met the criteria for commitment as a sexually violent person. *See* WIS. STAT. § 980.09(3). As noted above, in order to meet that burden, the State needed to prove three elements: (1) that O'Neal had been convicted of a sexually violent offense; (2) that O'Neal had a mental disorder, as that term is used in WIS. STAT. ch. 980; and (3) that O'Neal was dangerous to others because his mental disorder made it more likely than not that he would engage in one or more future acts of sexual violence. *See* WIS JI—CRIMINAL 2506; *see also*

WIS. STAT. § 980.01(7). On appeal, O'Neal does not dispute that the State presented sufficient evidence to establish the first and second of these elements. He argues, however, that the evidence was insufficient to support a determination that he was more likely than not to commit a future act of sexual violence.

¶21 "We utilize the criminal standard of review to determine whether there is sufficient evidence to prove a person was a sexually violent person subject to commitment." *State v. Kienitz*, 227 Wis. 2d 423, 434, 597 N.W.2d 712 (1999). Thus, we will not reverse an order denying a discharge petition based on insufficient evidence unless the evidence, viewed most favorably to the State and the commitment, is so insufficient in probative value and force that it can be said as a matter of law that no fact finder, acting reasonably, could have found by clear and convincing evidence that the defendant still met the criteria for commitment as a sexually violent person. *See id.*

¶22 If any possibility exists that the fact finder could have drawn the appropriate inferences from the evidence at the discharge trial to find that the defendant was still a sexually violent person, then we may not overturn the order denying discharge, even if we believe the fact finder should not have made that finding based on the evidence before it. *See id.* at 434-35. The fact finder, not this court, "determines issues of credibility, weighs the evidence and resolves conflicts in testimony." *Id.* at 435. Furthermore, the fact finder is "free to weigh [conflicting expert testimony] and decide which was more reliable; to accept or reject the testimony of any expert, including accepting only parts of an expert's testimony; and to consider all of the non-expert testimony" when deciding whether the State met its burden of proof. *Id.* at 441 (citation omitted).

9

¶23 Here, O'Neal has not met his "heavy burden" to show that the evidence was insufficient to support the circuit court's determination regarding his risk of reoffense. *See* ***State v. Beamon***, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. Pflugradt opined that O'Neal's risk of committing another sexually violent act exceeded the "more likely than not" threshold in WIS. STAT. ch. 980. She set forth the basis for that opinion, explaining O'Neal's scores on the Static-99R and the VRS-SO demonstrated that his risk of committing a sexually violent offense in the next ten years was "in the upper 30's." Pflugradt then explained that after applying "conservative" multipliers to account for O'Neal's lifetime risk of reoffense and the potential for undetected sexual offenses, she determined O'Neal's lifetime risk of committing a future act of sexual violence was fifty-two or fifty-three percent. Pflugradt also explained why she did not believe that O'Neal's age lessened his risk of committing a new sexually violent act. Pflugradt's testimony provided a sufficient basis for the court to find that O'Neal was more likely than not to commit a future act of sexual violence.

¶24 In addition, the circuit court could consider DeMarzo's testimony regarding O'Neal's progress in treatment and his adjustment to supervised release. DeMarzo testified that although O'Neal had positive treatment gains and had not engaged in significant violations of his rules of supervised release, he at times had trouble applying his treatment in a community setting. She explained that O'Neal had violated his rules by making unapproved purchases and by failing to be forthcoming about his arousal patterns and about his contact with individuals under age eighteen. DeMarzo also described how O'Neal had engaged in "offense paralleling behavior" toward a female treatment monitor, which involved playing "sadistic games" to see how she would react. DeMarzo further noted that O'Neal had admitted experiencing sexual attraction to postpubescent teenagers, as well as

having sexual thoughts about a ten-year-old girl. Based on DeMarzo's testimony, the court could find that O'Neal's behavior on supervised release outweighed his treatment progress and increased the likelihood that he would engage in future acts of sexual violence.

¶25    Although both Thornton and Lodl testified that O'Neal was not more likely than not to commit a future act of sexual violence, the circuit court was not required to accept their opinions. *See **Kienitz***, 227 Wis. 2d at 441. In fact, the court explained that it gave Pflugradt's testimony "greater weight" than that of the other experts because she "always [had] a specific reason to back up every bit of her testimony." The court also explained that it questioned Thornton's credibility based on the substantial difference between the risk estimate in his report and that to which he testified at trial. On this record, Thornton's and Lodl's opinions regarding O'Neal's risk of reoffense do not demonstrate that the other evidence at the discharge trial was insufficient to support the court's finding that O'Neal was more likely than not to commit a future sexually violent act.

¶26    O'Neal's arguments regarding the sufficiency of the evidence are unpersuasive. First, he contends the circuit court should not have relied on Pflugradt's opinion because she improperly considered his past noncontact offenses when determining his risk of committing a future sexually violent act. O'Neal notes that his noncontact offenses involving voyeurism and exhibitionism do not qualify as sexually violent offenses under WIS. STAT. § 980.01(6). He therefore argues his past commission of noncontact offenses has no relevance to his future risk of committing a sexually violent act.

¶27    Pflugradt testified, however, that O'Neal's voyeurism and exhibitionism are connected to his commission of sexually violent offenses. She

11

explained that those disorders are "wrapped into hypersexuality and sexual fantasies of violence," and that O'Neal had reported fantasizing about violent offenses when committing his voyeuristic and exhibitionistic offenses. Pflugradt also observed that O'Neal had acknowledged "that all of his hands-off offenses at some point in time have caused him to have sexually violent fantasies or caused him to want to commit a hands-on offense." Pflugradt therefore explained that even though O'Neal's voyeuristic and exhibitionistic offenses were not sexually violent, they contributed to his risk of committing a sexually violent offense. Moreover, Lodl also acknowledged a link between O'Neal's voyeurism and exhibitionism and his sexual sadism, opining that "[b]oth disorders appeared to be in the service of his sadistic interests and arousal to women." Based on Pflugradt's and Lodl's testimony, the circuit court could reasonably find that Pflugradt appropriately considered O'Neal's past noncontact offenses when determining his risk of committing a future sexually violent act.

¶28   O'Neal also asserts that although his record "includes numerous instances of exhibitionism and voyeurism, there were only two acts of sexually violent behavior"—his predicate offenses in 1975, and a subsequent, self-reported prison rape. He contends there is no record of him committing a sexually violent offense since 1996, which undermines Pflugradt's opinion that he is more likely than not to commit a future act of sexual violence.

¶29   As the State correctly notes, however, the record actually contains evidence that O'Neal has committed three sexually violent offenses during his life— those listed above, as well as the incident when he attempted to rape a fourteen-year-old girl after seeing her while riding his motorcycle. More importantly, when assessing O'Neal's risk of committing a future act of sexual

violence, the circuit court could consider the fact that O'Neal has been in controlled environments for much of his adult life.

¶30    Both Pflugradt and Thornton diagnosed O'Neal's sexual sadism, exhibitionism, and voyeurism as being "in a controlled environment." Thornton further explained that "currently, and for many years, Mr. O'Neal has lived under circumstances where opportunities to act on these sexual interests [have] been restricted and where, should he act on them, there would be a high probability of detection and punitive sanctions." Thornton also observed that O'Neal's supervised release qualifies as a controlled environment because it "takes the form of a highly restricted lifestyle in which he is extensively monitored and chaperoned." Based on this evidence, the circuit court could reasonably infer that O'Neal's commission of only three sexually violent offenses was attributable to his extended time in controlled environments and therefore does not demonstrate that his future risk of committing a sexually violent act falls below the "more likely than not" threshold.

¶31    In his reply brief, O'Neal also argues that his diagnosis of sexual sadism, in and of itself, is insufficient to permit an inference that he will more likely than not commit a future act of sexual violence. The circuit court did not, however, find that O'Neal was more likely than not to commit a future sexually violent act based solely on his sexual sadism diagnosis. Rather, the court relied on Pflugradt's expert opinion that O'Neal's future risk of committing a sexually violent act exceeded the "more likely than not" threshold. Pflugradt's testimony, along with the other evidence discussed above, was sufficient to support the court's finding in that regard.

¶32    Finally, O'Neal contends that by stating the State had only met its burden of proof "by the razor thin edge," the circuit court essentially asserted that it

was "able to determine [his] risk of reoffense down to a few percentage points." O'Neal argues that "level of precision, based only on the evidence presented in this case, is simply inconceivable." He then cites *Wiggins Construction Co. v. Joint School District No. 3*, 35 Wis. 2d 632, 640, 151 N.W.2d 642 (1967), where our supreme court stated: "If the credible evidence would allow reasonable minds to differ as to the conclusions to be drawn from the evidence, then this case should have been submitted to the jury."

¶33     The issue on appeal, however, is not whether a jury, rather than the circuit court, should have determined whether the State met its burden of proof at O'Neal's discharge trial. The issue is whether there was sufficient evidence for the court, acting as fact finder, to find that O'Neal was more likely than not to commit a future act of sexual violence. Again, Pflugradt testified that O'Neal's lifetime risk of committing a sexually violent act was "[t]wo to three percentage points" above fifty percent, and the court gave her testimony greater weight than that of O'Neal's experts. Pflugradt's testimony provided a sufficient basis for the court to find that O'Neal was more likely than not to commit a future act of sexual violence, even if his risk of reoffense only slightly exceeded the "more likely than not" threshold. The court's apparent belief that this was a close case does not compel a conclusion that the evidence was insufficient to support its finding regarding O'Neal's risk of reoffense.

        *By the Court.*—Order affirmed.

        This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

14